[Cite as *State v. Walker*, 2023-Ohio-1949.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## LAKE COUNTY

STATE OF OHIO,

        Plaintiff-Appellee,

- vs -

PARIS D. WALKER,

        Defendant-Appellant.

CASE NOS. 2022-L-077
           2022-L-078

Criminal Appeals from the
Court of Common Pleas

Trial Court Nos. 2021 CR 001234
               2021 CR 001101

**O P I N I O N**

Decided: June 12, 2023
Judgment: Affirmed

*Charles E. Coulson*, Lake County Prosecutor, and *Jennifer A. McGee*, Assistant Prosecutor, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Brian A. Smith*, Brian A. Smith Law Firm, LLC, 123 South Miller Road, Suite 250, Fairlawn, OH 44333 (For Defendant-Appellant).

EUGENE A. LUCCI, J.

{¶1} Walker appeals his sentencing entries issued in two separate cases. We affirm.

{¶2} The first case, Case No. 2021 CR 001101, stems from a traffic stop of Walker in June 2021. At that time, Walker was driving a 2004 Dodge Stratus registered in his name. During the stop, Walker was searched, and officers located a pill bottle containing suspected crack cocaine and four small baggies containing suspected powder

cocaine in his pockets. Officers arrested Walker, and, upon booking him into jail, located $165 in cash on his person.

{¶3} Walker was charged with trafficking in cocaine, in an amount exceeding 20 grams but less than 27 grams, a second-degree felony, in violation of R.C. 2925.03(A)(2), with attendant forfeiture specifications for the cocaine, pill bottle, plastic baggies, Dodge Stratus, and $165 in cash; and possession of cocaine in an amount equaling 20 grams but less than 27 grams, a second-degree felony, in violation of R.C. 2925.11.[1]

{¶4} Walker pleaded not guilty, and the case was scheduled for jury trial. On the date first set for jury trial, Walker appeared at the court and, prior to commencement of trial, requested a continuance because he was unhappy with his current representation and had obtained new counsel, who was not then present. The court denied the continuance and informed Walker that the jury trial would proceed on that date as scheduled. Thereafter, the court held an off-record discussion with counsel in chambers. When the court returned on the record, it stated that Walker had left the courthouse, and, when defense counsel contacted him by telephone, Walker advised counsel that he would not be returning for trial that day. The court revoked Walker's bond and issued a warrant for his arrest.

{¶5} Thereafter, Walker was arrested and detained, and the case proceeded to jury trial. The jury found Walker guilty on both counts and found that the vehicle was subject to forfeiture, but not the cash. The court referred the case for a presentence

---

1. The indictment included forfeiture specifications attendant to the possession count as well. However, these specifications were dismissed on motion of the state prior to trial.

2

Case Nos. 2022-L-077 and 2022-L-078

report and investigation ("PSI") and indicated that a proportionality hearing regarding the vehicle would be held at the same time as sentencing.

{¶6} The second case, Case No. 2021 CR 001234, stems from a traffic stop of Walker in September 2021, while he was initially on bond in the first case. At that time, a police officer was investigating an animal complaint and observed Walker drive a vehicle into the driveway of a house that was under investigation for suspected drug activity. Walker remained there for one to two minutes, during which time a resident came out to the car, leaned into Walker's window, and then returned to the residence. Walker then pulled out of the driveway. As Walker drove by the officer, the officer ran Walker's plates and determined that the vehicle was registered to Walker, and his license was suspended. The officer further observed that neither Walker nor a passenger in his car were wearing safety belts. The officer initiated a traffic stop and ultimately searched the vehicle, Walker, and his passenger. In the passenger's pocket, the officer located a pill bottle bearing Walker's name containing crack cocaine. Walker informed the officer that he had been handed crack cocaine at the residence he had just left, and Walker put the drugs in his pill bottle. The search of the vehicle revealed baggies of powder cocaine between the driver's seat and center console and loose crack cocaine rocks inside the center console and underneath the floor mats.

{¶7} Thereafter, Walker was charged with three counts of possession of cocaine in an amount less than five grams, fifth-degree felonies, in violation of R.C. 2925.11, with forfeiture specifications attendant to each count for the cocaine, prescription bottle, and plastic baggie. After initially pleading not guilty, Walker changed his plea to guilty on all

3

three counts. The court accepted the pleas and deferred sentencing for a PSI to be completed in conjunction with Case No. 2021 CR 001101.

{¶8} The cases proceeded to sentencing at the same hearing. In Case No. 2021 CR 001101, the court ordered merger of the two counts as allied offenses of similar import, and the state elected to proceed to sentencing on the trafficking count. The court sentenced Walker to an indefinite prison term of five to seven and one-half years, to be served consecutively to the sentence imposed in Case No. 2021 CR 001234. The court further found that the value of the Dodge Stratus was proportionate to the severity of the offense, and ordered the Dodge, cocaine, pill bottle, and plastic baggies forfeited. In Case No. 2021 CR 001234, the court merged the first and third counts of possession of cocaine as allied offenses of similar import. The state elected to proceed to sentencing on the first count. The court sentenced Walker to nine months of imprisonment on each of the first and second counts of possession of cocaine to be served concurrently with each other but consecutively to the sentence imposed in Case No. 2021 CR 001101. The court further ordered the cocaine, prescription bottle, and plastic baggie forfeited.

{¶9} In his first assigned error, Walker argues:

{¶10} "Appellant's convictions in case number 2021 CR 001101 were against the manifest weight of the evidence."

{¶11} The "[w]eight of the evidence concerns 'the inclination of the *greater amount of credible evidence* * * * to support one side of the issue rather than the other.'" (Emphasis sic.) *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting Black's Law Dictionary 1594 (6th Ed.1990). When considering challenges to the weight of the evidence, the appellate court reviews "'the entire record, weighs the

4

evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a ""thirteenth juror"" and disagrees with the factfinder's resolution of the conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42, 72 L.Ed.2d 652, 102 S.Ct. 2211, 2218 (1982). "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *Martin* at 175.

{¶12} Here, Walker maintains that the "convictions" for trafficking in cocaine and possession of cocaine are against the manifest weight of the evidence. However, as set forth in our recitation of the procedural history above, the trial court merged these counts in this case, and the state elected to proceed to sentencing on the trafficking charge. Because the possession count merged into the trafficking count, no sentence was imposed on the possession charge, and "therefore there is no conviction on that charge[,]" and any error with regard to the possession charge in this case "is not relevant." *State v. Whetstone*, 11th Dist. Lake No. 2015-L-114, 2016 WL 5637253, ¶ 26, citing *In re J.C.*, 11th Dist. Lake No. 2012-L-083, 2013-Ohio-1292, ¶ 22.

{¶13} Accordingly, we proceed to review the weight of the evidence regarding the trafficking charge only. Walker was convicted of trafficking in cocaine in an amount

5

exceeding 20 grams but less than 27 grams, in violation of R.C. 2925.03(A)(2). R.C. 2925.03(A)(2) provides:

> No person shall knowingly * * * [p]repare for shipment, ship, transport, deliver, prepare for distribution, or distribute a controlled substance or a controlled substance analog, when the offender knows or has reasonable cause to believe that the controlled substance or a controlled substance analog is intended for sale or resale by the offender or another person.

{¶14} Pursuant to R.C. 2901.22(B):

> A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

{¶15} In support of the trafficking charge, at trial, the state first elicited testimony from the officers involved in the stop and search of Walker and his vehicle. The testimony indicated that, at approximately 3:39 p.m. on the afternoon of June 28, 2021, an officer stopped Walker after he turned left at a red light in a residential neighborhood in Eastlake. After determining that Walker had a suspended license, another officer came to the scene per the police department's protocol. Walker informed the officers that he had occupational driving privileges. Although no driving privileges were indicated in the officers' system, they assisted Walker in looking for the paperwork granting the privileges, as Walker attempted to obtain the documentation on his cell phone. When Walker was unable to produce proof of driving privileges, an officer asked him to exit the vehicle so that it could be towed pursuant to department policy. Upon exiting the vehicle, an

6

unlabeled pill bottle fell out of Walker's right shorts' pocket. On closer inspection of the pill bottle, the officers observed a rock substance in the bottle. The officers placed Walker under arrest and then conducted a search of his person, locating four baggies of suspected narcotics in his left pocket. When booking Walker into jail, $165 in cash was located on his person.

{¶16} On cross-examination of the officers, they each confirmed that they did not witness Walker prepare or package any of the narcotics, nor did they see him engage in any transaction with any other person.

{¶17} In addition, over the objection of defense counsel, one of the officers testified that he was previously subpoenaed for a jury trial in this case that was to be held on a prior date. The officer did observe Walker at the court on that date, but, when trial was to commence, Walker was no longer present. On cross-examination on this issue, the officer recalled that Walker requested a continuance on the previously scheduled jury trial date due to an issue with his then attorney. However, the officer maintained that, after a break in the proceedings, the officer returned to the courtroom for the trial to commence, and Walker was no longer present. On redirect-examination, the officer confirmed that, on the previously scheduled trial date, the judge informed Walker that they would be proceeding to trial on that day prior to Walker leaving the courthouse.

{¶18} The state then elicited testimony from a forensic analyst employed by the Lake County Crime Laboratory ("the Crime Lab"). The analyst testified that she tested the substances submitted in this case. She concluded that the small bags of white powder, without considering the weight of the bags, contained cocaine in the following net weights: 3.12 grams, 3.36 grams, 3.23 grams, and 3.37 grams. The unmarked pill

7

bottle contained 7.17 net grams of cocaine. The total net weight of cocaine submitted in this case was 20.25 net grams.

{¶19} Last, the state elicited the testimony of Lieutenant Brad Kemp of the Lake County Narcotics Agency. Kemp testified that he has worked for the Lake County Narcotics Agency for 27 years, starting first as an agent, then serving about 20 years as a sergeant, and then working in the capacity of a lieutenant for the last year. Prior to his employment at the Lake County Narcotics Agency, Kemp worked for a law enforcement drug unit on the east side of Cleveland for two years. Early in his career he worked undercover conducting drug buys with information provided by informants. He had also been involved with thousands of controlled buys wherein the informant purchased the drugs under the direction of law enforcement. Kemp has spent the entirety of his career specifically dealing with narcotics.

{¶20} With respect to his training, Kemp testified that, along with completing the police academy, he has received thousands of hours of specialized training specifically related to drug investigations through the Ohio Peace Officer Training Academy, the FBI, and other law enforcement agencies.

{¶21} Kemp maintained that, through his work, he has personally observed street drugs and is familiar with how different drugs are packaged for sale. Kemp maintained that most drugs, particularly powder drugs, are sold by weight. With respect to cocaine, Kemp indicated that, when sold in powder form, it is often packaged in plastic baggies or paper bindles. Kemp stated that powder cocaine is typically sold in terms of ounces or grams. One eighth of an ounce is generally referred to as an "eight ball," and weighs approximately 3.5 grams. However, Kemp testified that he has never experienced a drug

8

buy where he obtained the exact weight, and it is typically lighter than what it should be. Thus, for an eight ball, he would expect it to weigh approximately 3 grams. Kemp indicated that crack cocaine is typically sold by the rock, with the rock size usually weighing .15 to .20 grams. Kemp further stated that the higher weight of drugs purchased results in a lower price per ounce/gram.

{¶22} The state inquired if Kemp had ever testified as an expert, to which he responded in the affirmative, stating that he had testified as an expert 19 times in Lake County courts on the subject of weights, prices, and packaging of drugs. Although the state did not request the court to qualify Kemp as an expert in this case, Kemp indicated that he was asked to review information regarding this case. In doing so, Kemp reviewed the police report, the Crime Lab report, and a photograph of the evidence. Kemp testified that, from his analysis, it appeared that the evidence contained four eight balls of cocaine, with a street value of $150 to $200 per eight ball, and he opined the packaging and amount was indicative of trafficking. Further, he opined that the amount of cash located on Walker's person, $165, is consistent with the value of an eight ball. Kemp further testified that the 7.17 grams of crack cocaine was also indicative of trafficking because of the quantity of drugs in the pill bottle. On cross-examination, Kemp affirmed that he had no involvement in this case prior to his review of the evidence and reports.

{¶23} After Kemp's testimony, the state rested. The defense then moved for acquittal pursuant to Crim.R. 29, which the trial court overruled. Thereafter, the defense rested without presenting evidence.

{¶24} In his first assigned error, Walker argues that "the State's evidence failed to show that Walker had either 'sold or offered to sell' a controlled substance, or that he had

9

knowingly prepared the substance for shipment, shipped it, transported it, delivered it, prepared it for distribution, or distributed it," as there was no evidence of intent.[2]

{¶25} However, Kemp indicated that an "eight ball" is a common quantity in which to purchase powdered cocaine, and crack cocaine is purchased by the rock. Walker had four separately packaged baggies of cocaine in roughly the weight of an "eight ball." In addition, he had 7.17 grams of crack cocaine in a pill bottle. He was carrying these drugs on his person while driving in a residential area in Eastlake in the middle of the afternoon. From the evidence presented, the jury could reasonably infer Walker's intent to transport the cocaine for sale. This is not the extraordinary case where the evidence weighs heavily against the conviction.

{¶26} Accordingly, Walker's first assigned error is without merit.

{¶27} In his second and third assigned errors, Walker maintains:

{¶28} "[2.] The trial court committed plain error, in case number 2021 CR 001101, in allowing Brad Kemp to testify as an expert regarding the purpose of the evidence seized from Appellant."

{¶29} "[3.] The failure of Appellant's trial counsel to object, in case number 2021 CR 001101, to Brad Kemp's testimony regarding the purpose of the evidence seized from Appellant, constituted ineffective assistance of counsel and a violation of Appellant's right to counsel under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution."

---

2. In his appellate brief, Walker further states that he "denied any intent to sell the drugs and insisted that any substances found were for personal use." In support of this statement, Walker cites the PSI. A challenge to the manifest weight of the evidence supporting a conviction involves a review of the evidence admitted at trial. Walker did not testify at trial, and the statements he made during the presentence investigation are not properly considered in this review.

10

Case Nos. 2022-L-077 and 2022-L-078

{¶30} Walker's second and third assigned errors pertain to the testimony of Brad Kemp, which we discussed in our review of Walker's first assigned error. Walker recognizes that defense counsel did not object to Kemp's testimony, and thus his second assigned error challenges Kemp's testimony on this issue under a plain error standard, and his third assigned error alleges ineffective assistance of counsel for failure to object to Kemp's testimony.

{¶31} With respect to plain error, "Crim.R. 52(B) affords appellate courts discretion to correct '[p]lain errors or defects affecting substantial rights notwithstanding the accused's failure to meet his obligation to bring those errors to the attention of the trial court." *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22. "However, the accused bears the burden of proof to demonstrate plain error on the record, * * * and must show 'an error, i.e., a deviation from a legal rule' that constitutes 'an "obvious" defect in the trial proceedings[.]'" *Id.*, quoting *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). "[E]ven if the error is obvious, it must have affected substantial rights," meaning "'that the trial court's error must have affected the outcome of the trial.'" *Rogers* at ¶ 22, quoting *Barnes* at 27.

{¶32} With respect to ineffective assistance of counsel, to prevail on such a claim, "a defendant must prove that counsel's performance was deficient and that the defendant was prejudiced by counsel's deficient performance." *State v. Davis*, 159 Ohio St.3d 31, 2020-Ohio-309, 146 N.E.3d 560, ¶ 10, citing *State v. Bradley*, 42 Ohio St.3d 136, 141-142, 538 N.E.2d 373 (1989); and *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "Thus, the defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness and that there exists a

11

reasonable probability that, but for counsel's error, the result of the proceeding would have been different." *Davis* at ¶ 10, citing *Bradley* at paragraphs two and three of the syllabus.

{¶33} Accordingly, both plain error and ineffective assistance of counsel claims require a showing of an error and that there exists a reasonable probability that the error affected the outcome of trial. *See Rogers* at ¶ 22.

{¶34} Here, Walker premises his second and third assigned errors on his proposition that Kemp was unqualified to testify as an expert under the criteria set forth in Evid.R. 702. However, as set forth in our discussion of Walker's first assigned error, although the state asked Kemp if he had ever testified as an expert, and Kemp responded affirmatively, the state never requested the trial court qualify Kemp as an expert in this case. Despite Walker's recognition that the state did not request Kemp to be qualified as an expert here, both Walker's and the state's arguments on appeal focus on whether Kemp properly testified as an expert.

{¶35} As the parties focused their arguments on Kemp's qualifications as an expert, but the court did not specifically qualify Kemp as an expert, we will review the propriety of Kemp's testimony under the evidentiary rules applying to both lay and expert opinion testimony. *See State v. Nabinger*, 10th Dist. Franklin No. 94APA07-981, 1995 WL 360301, *10 (June 13, 1995) (reviewing officer's testimony as a lay witness where no threshold determination that officer was qualified as an expert was made by or requested in trial court), and *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 115-116 (reviewing propriety of officer's testimony as an expert although state did not formally tender officer as an expert).

12

Case Nos. 2022-L-077 and 2022-L-078

{¶36} Evid.R. 701, which applies to opinion testimony by lay witnesses, provides that "[i]f the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."

{¶37} Evid.R. 702 governs expert testimony, and provides:

A witness may testify as an expert if all of the following apply:

(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;

(2) The design of the procedure, test, or experiment reliably implements the theory;

(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.

{¶38} Moreover, Evid.R. 704 provides that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact."

13

{¶39} Here, Kemp's testimony was based upon his review of the evidence and his knowledge and experience investigating drug trafficking. Law enforcement officers may testify as to their opinions as lay witnesses if their testimony otherwise meets the requirements of Evid.R. 701, i.e. when the testimony is based on their own perceptions, and their training and experience have provided them with knowledge that would assist the trier of fact in resolving an issue. *See State v. Garrett*, Supreme Court Slip Opinion No. 2022-Ohio-4218, *reconsideration denied*, 168 Ohio St.3d 1478, 2022-Ohio-4652, 200 N.E.3d 254, (detectives with experience in processing crime scenes and homicide were qualified to provide lay opinion testimony that the offender in a stabbing incident may suffer cuts to his own hand due to the offender's hand slipping onto the blade), citing *State v. Coit*, 10th Dist. Franklin No. 02AP-475, 2002-Ohio-7356, ¶ 40 ("experience as a police officer and familiarity with blunt-force trauma and past observation of wounds permitted detective's testimony that cuts on victim's leg were consistent with being hit by a brick").

{¶40} Thus, an officer sufficiently experienced in narcotics transactions may offer opinions as to whether the evidence was consistent with trafficking under Evid.R. 701. *State v. Crenshaw*, 8th Dist. Cuyahoga No. 60671, 1992 WL 126037, *2 (June 4, 1992); *State v. Gale*, 8th Dist. Cuyahoga No. 94872, 2011-Ohio-1236, ¶ 14; *State v. McClain*, 6th Dist. Lucas No. L-10-1088, 2012-Ohio-5264, ¶ 13 (detective's "testimony that the quantity of drugs was consistent with intent to sell the drugs was based on his perception and experience as a police officer, a permissible basis for opinion under Rule 701"). *See also State v. Slade*, 7th Dist. Mahoning No. 16 MA 0177, 2018-Ohio-2767, ¶ 19-30 (where counsel failed to object to state's failure to disclose officer as expert and failed to object

14

Case Nos. 2022-L-077 and 2022-L-078

to officer's qualifications, officer's testimony that large amount of cash in various denominations found on defendant indicated drug trafficking would likely have been permitted as lay opinion testimony).

{¶41} Here, Kemp testified as to his extensive training and experience in law enforcement investigations of drug trafficking. His opinions regarding the evidence being consistent with trafficking were based upon his own perceptions and were helpful to determination of a fact in issue. Therefore, Kemp's testimony was properly admitted as lay opinion testimony under Evid.R. 701.

{¶42} Further, Kemp's testimony was also admissible as expert testimony pursuant to Evid.R. 702. In a decision addressing whether the admission of an officer's gang-related testimony amounted to plain error, the Supreme Court of Ohio explained:

> [The officer] had worked in the gang unit for the Youngstown Police Department since 1999 and at the time of his testimony was in charge of the unit. [The officer] gained his knowledge and experience about Youngstown gangs through investigating gang activities in the Youngstown area. [The officer's] testimony showed that he possessed specialized knowledge about gang symbols, cultures, and traditions beyond that of the trier of fact. *See State v. Jefferson*[, 9th Dist. Summit No. 20156, 2001 WL 276343, *5 (Mar. 21, 2001)]; *State v. Lewis*[, 2d Dist. Greene No. 96 CA 12, 1997 WL 156596, *6-7 (Apr. 4, 1997)]. Thus, [the officer] was qualified to testify as an expert about gang-related matters.

*Drummond*, 2006-Ohio-5084, at ¶ 115-116. Similarly, here, Kemp's extensive experience and training in narcotics qualified him to testify as an expert in drug trafficking matters, and his testimony demonstrated he possessed specialized knowledge about the packaging and sale of drugs beyond that of the trier of fact. *See also State v. Freshwater*, 11th Dist. Lake No. 2018-L-117, 2019-Ohio-2968, ¶ 21 (also involving Kemp's testimony as an expert, and concluding that without his testimony, "the jury would not necessarily

15

Case Nos. 2022-L-077 and 2022-L-078

know how marijuana is typically packaged or weighed for sale or resale, as opposed to personal use").

{¶43} Walker maintains that Kemp improperly testified as an expert in that the scope of his expertise cannot be as broad as "drugs" or "drug trafficking" because of "the variety of controlled substances that exist and the widely varying methods by which they are produced, distributed, and consumed." Walker appears to argue that an expert in drug trafficking must focus on one particular narcotic. However, we are aware of no authority requiring expertise to be so limited.

{¶44} Further, Walker argues that, if defense counsel had requested a *Daubert* hearing, it is unclear how the state could have produced evidence to show that Kemp's testimony was "scientifically reliable." *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). A similar argument was raised with regard to the testimony of the officer in *Drummond*. However, the Supreme Court of Ohio explained:

> In *Daubert*, the United States Supreme Court held that under Fed.R.Evid. 702, the trial judge has a special obligation to ensure that scientific testimony is not only relevant but reliable. *Daubert*, * * * at 589-590, 597 * * *. In *Kumho Tire Co., Ltd. v. Carmichael*[,526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)], the United States Supreme Court extended this gate-keeping obligation to include all expert testimony—i.e., testimony based on technical and other specialized knowledge. The court added that in assessing reliability, the trial court may, at its discretion, consider the *Daubert* factors to the extent relevant. *Id.* at 148, 119 S.Ct. 1167, 143 L.Ed.2d 238.
>
> Without a defense objection, the trial court was not required to conduct a hearing to determine the relevance and reliability of [the officer's] testimony on gangs. In a similar case involving testimony by a police gang expert, the Ninth Circuit Court of Appeals held that the *Daubert* factors (peer review,

16

publication, potential error rate, etc.) *do not apply to this kind of testimony. The court recognized that unlike scientific testimony, expert testimony about gangs depends heavily on the expert's knowledge and experience rather than on the expert's methodology and theory. United States v. Hankey*[, 203 F.3d 1160, 1169 (9th Cir.2000)].

Nothing in [the officer's] testimony about gangs raises any reliability question. His testimony was based on his knowledge and experience with the Lincoln Knolls Crips and its members. Thus, the trial court committed no plain error by admitting [the officer's] testimony.

(Emphasis added.) *Drummond* at ¶ 118-119.

**{¶45}** Likewise, here, nothing in Kemp's testimony raises a reliability question. Kemp's testimony was based on knowledge and experience in the field of narcotics, and, thus, the *Daubert* factors do not apply to this kind of testimony.

**{¶46}** Lastly, we note that Walker presents a limited argument that Kemp's testimony was improper because it was unnecessarily cumulative. However, he has not advanced an argument demonstrating the requisite prejudice to establish plain error or ineffective assistance of counsel on this issue.

**{¶47}** Based on the foregoing, we conclude that Walker has failed to demonstrate plain error or ineffective assistance of counsel with respect to Kemp's testimony. Accordingly, Walker's second and third assigned errors lack merit.

**{¶48}** In his fourth assigned error, Walker argues:

**{¶49}** "The trial court abused its discretion, in case number 2021 CR 001101, in giving a jury instruction on consciousness of guilt."

**{¶50}** "Requested jury instructions should be given if they are (1) correct statements of the applicable law, (2) relevant to the facts of the case, and (3) not included in the general charge to the jury." *State v. Kessler Scott*, 11th Dist. Lake No. 2022-L-018,

17

Case Nos. 2022-L-077 and 2022-L-078

2022-Ohio-4054, ¶ 43, citing *State v. McEndree*, 2020-Ohio-4526, 159 N.E.3d 311, ¶ 63 (11th Dist.). "This court generally reviews jury instructions under an abuse of discretion standard .so long as the instruction is a correct statement of law." *Kessler Scott* at ¶ 43.

{¶51} Here, the state requested an instruction on consciousness of guilt based upon the evidence that Walker left the courthouse on the date that the jury trial had previously been scheduled to commence, as set forth in our discussion of Walker's first assigned error. Over Walker's objection, the trial court instructed the jury on consciousness of guilt as follows:

> Now, in this case, testimony has been admitted indicating that in April of twenty-twenty-two, the Defendant left the courthouse prior to the commencement of a previously-scheduled jury trial in this case, and thus, the trial could not go forward. Now in regards to this evidence, you are instructed that the Defendant leaving the courthouse and not being present for the commencement of the previously-scheduled jury trial does not alone raise a presumption of guilt, but it may tend to indicate the Defendant's consciousness of guilt. If you find that the facts do not support that the Defendant left the courthouse and was not present for the commencement of the previously-scheduled trial in this case, or if you find that some other motive prompted the Defendant's conduct, or if you are unable to decide what the Defendant's motivation was, then you should not consider this evidence for any purpose.
>
> However, if you find that the facts support that the Defendant left the courthouse prior to the commencement of a previously-scheduled jury trial in this case, and if you decide the Defendant was motivated by a consciousness of guilt, you may, but are not required to, consider that evidence in determining whether the Defendant is guilty of the crimes charged. You alone will determine what weight, if any, to give to this evidence.

{¶52} On appeal, Walker does not argue that the instruction incorrectly states the law. Instead, he contends that the trial court abused its discretion in instructing the jury

18

Case Nos. 2022-L-077 and 2022-L-078

on consciousness of guilt because Walker's reason for leaving was based on his desire to obtain the counsel of his choice.[3]

{¶53} However, the consciousness of guilt instruction itself informs the jury that, if it finds that some other motive prompted the conduct, or if the jury cannot decide what motivated the conduct, then the jury is not to consider the evidence for any purpose. Accordingly, "'the flight instruction is all but innocuous.'" *Kessler Scott*, 2022-Ohio-4054, at ¶ 49, quoting *State v. White*, 2015-Ohio-3512, 37 N.E.3d 1271 (2d Dist.). Given the nature of the instruction and the evidence presented regarding Walker's departure from the courthouse, we conclude that the trial court did not error in giving the instruction.

{¶54} Accordingly, Walker's fourth assigned error lacks merit.

{¶55} In his fifth assigned error, Walker maintains:

{¶56} "The trial court erred in ordering, in case number 2021 CR 001101, that the 2004 Dodge Stratus was subject to forfeiture."

{¶57} More specifically, Walker contends that the trial court erred in determining that the state met its burden of establishing that the value of the 2004 Dodge Stratus was proportionate to the severity of the offense.

{¶58} R.C. 2981.09 provides:

> (A) Property may not be forfeited as an instrumentality under this chapter to the extent that the amount or value of the property is disproportionate to the severity of the offense. The state or political subdivision shall have the burden of going forward with the evidence and the burden to prove by clear and convincing evidence that the amount or value of the

---

3. Walker also maintains that the trial court improperly denied his motion to continue. However, Walker does not fully develop an argument in support of this contention, nor does he separately assign this as error in his brief. *See* App.R. 16(A)(7). Accordingly, this court will not address the propriety of the denial of the continuance.

19

property subject to forfeiture is proportionate to the severity of the offense.

* * *

(C) In determining the severity of the offense for purposes of forfeiture of an instrumentality, the court shall consider all relevant factors including, but not limited to, the following:

(1) The seriousness of the offense and its impact on the community, including the duration of the activity and the harm caused or intended by the person whose property is subject to forfeiture;

(2) The extent to which the person whose property is subject to forfeiture participated in the offense;

(3) Whether the offense was completed or attempted;

(4) The extent to which the property was used in committing the offense;

(5) The sentence imposed for committing the offense that is the basis of the forfeiture, if applicable.

(D) In determining the value of the property that is an instrumentality and that is subject to forfeiture, the court shall consider relevant factors including, but not limited to, the following:

(1) The fair market value of the property;

(2) The value of the property to the person whose property is subject to forfeiture, including hardship to the person or to innocent persons if the property were forfeited. The burden shall be on the person whose property is subject to forfeiture to show the value of the property to that person and any hardship to that person.

{¶59} Here, during the proportionality hearing, the state again provided the testimony of the officer who stopped Walker in Eastlake. The officer testified that he has experience in drug investigations and arrests. The officer indicated that he has encountered situations where the drugs risked the health or safety of citizens, primarily

20

Case Nos. 2022-L-077 and 2022-L-078

through overdoses. The officer stated that drugs have a "pretty serious" impact on the Eastlake community, which could affect all residents, as even those not directly involved in drug activity could have safety concerns through knowledge of drug activity in the city. The officer maintained that he has assisted in police investigations of drug-related shootings in the city.

{¶60} With respect to this specific case, the officer explained that he conducted the traffic stop on Walker after observing him make a red-light violation while driving his 2004 Dodge Stratus. Walker had the drugs on his person when he exited the vehicle— the powder cocaine in baggies in one pocket, and the crack cocaine in a pill bottle in the other pocket. In all, Walker was transporting 20.25 grams of cocaine. The four baggies of cocaine had a value of approximately $150 per bag, and the pill bottle contained approximately 30-40 rocks, with a total value of approximately $300 to $425. Nothing else was found in the vehicle. The officer maintained that Walker lives in South Euclid, which is an approximate 20- to 25-minute drive from Eastlake. The state asked the officer to identify an exhibit, which the officer recognized as a certified copy of the title to the Dodge Stratus. The mileage noted on the title is 93,887 miles. The title indicates that the title was signed over to Walker on July 9, 2021, and it was a gift. The officer maintained that the mileage on the vehicle is currently 98,887, which would have been approximately the same mileage of the vehicle when it was stopped on July 28, 2021. The officer indicated that through the LEADS system, he learned that Walker has four additional vehicles registered to him. The officer opined that the Dodge Stratus was in poor condition, as it was rusting. The officer recognized another exhibit as an appraisal

21

of what the vehicle would be worth based on its condition and mileage. The exhibit indicates a trade-in value of $700, a loan value of $1,575, and a resale value of $3,300.

{¶61} On cross-examination, the officer affirmed that he had not witnessed Walker conduct any type of drug transaction in this case, and the charges arose only from the drugs that Walker had on him after the traffic stop. The officer affirmed that there were no guns or other weapons found in the car. Further, the officer opined it was not unusual for an individual to drive 20 to 25 minutes from his home. In addition, the officer indicated that there is a lot of shopping in Eastlake. The officer affirmed that he has no knowledge regarding the condition of the other cars that are registered in Walker's name. The officer further indicated that he checked the odometer reading of the Dodge Stratus in impound on the state's request, and he could have taken a picture of the odometer but did not do so. The officer also confirmed that he does not work for the title bureau and based his reading of the title from the physical copy combined with his own basic knowledge of titles gained from his purchase of personal vehicles. With respect to the exhibit regarding the value of the vehicle, the officer confirmed that he did not print or create this document, and instead was given this exhibit by the prosecutor's office. His testimony regarding value was based on what the document stated.

{¶62} On redirect examination, the officer stated he has basic common knowledge of how a car title is completed, which was consistent with the method with which the title was completed for the Dodge Stratus. With respect to the valuation exhibit, the officer stated that it was printed at Willoughby Chrysler Jeep Dodge and Ram, and the valuation is accessible to the public.

22

{¶63} Based on the information presented as well as the evidence presented at trial and the factors set forth in R.C. 2981.09, the court found that the value of the property subject to forfeiture was proportionate to the severity of the offense.

{¶64} On appeal, Walker maintains that the officer's testimony did not demonstrate an "impact" on the community, because the officer's testimony related more to other drugs, such as fentanyl, and not specifically on cocaine. Further, the officer waivered on whether the community was impacted by the offense here, stating that "there could be" a risk to the health and safety of those in the community from cocaine. In addition, Walker argues that the state failed to prove that the offense was completed, rather than attempted. Moreover, Walker maintains that the state attempted to "downplay the value of the vehicle" because the officer admitted he did not have special training in vehicle resale values and was simply reading numbers from the state's printout pertaining to value. Further, Walker maintains that the officer's testimony regarding the information contained on the title was not corroborated by a witness from the Title Bureau or the BMV. Additionally, Walker argues that the trial court did not take into account an inflationary environment influenced by the COVID-19 pandemic or the possible financial impact to others who may use the vehicle, such as Walker's family or coworkers, and who may place a higher value on the vehicle based upon their needs. Last, Walker maintains that the "gift" notation on the title may indicate some level of sentimental value in the vehicle to Walker.

{¶65} However, Walker's latter arguments are speculative, and Walker did not provide evidence of the value of the vehicle to him. *See* R.C. 2981.09(D)(2) ("The burden shall be on the person whose property is subject to forfeiture to show the value of the

23

property to that person * * *.").  Further, our review of the record indicates that the state

presented evidence pertaining to the proportionality factors, and the trial court properly

considered the factors in ordering forfeiture, stating:

> The seriousness of the offense, its impact on the community is significant.  Drugs are preying on our society, creating the risks to health and safety of all citizens in the community whether they know about it or not.  Just because someone may not know what's going on, the drug trafficking is taking place outside their home, they're at risk for what could happen if a drug deals (sic.) goes bad.  Police chases take place perhaps throughout the community because of this type of conduct.
>
> The fact of the matter is, this drug offense is a felony of the second degree which is very serious.  We don't get very many felonies of the second degree drug offenses. It's mandatory prison.  At a minimum two to three years, maximum of eight to twelve years.  There's a mandatory fine which must be imposed of at least $7500.00.  So it's a significant, serious offense.  Not just an F-5 low-level felony drug offense.  It's a felony of the second degree.
>
> To the extent to which the Defendant is the owner of the property and participated in the offense, he was the sole person involved with the offense in this particular matter.  The car was used to commit the offense.  This wasn't just him possessing the drug.  It was him using the vehicle to transport or ship these drugs so that they could be resold.  That's what the jury found the Defendant guilty of and the car was used to do that.
>
> In determining any type of hardship, that burden is on the Defendant.  But nonetheless, there isn't much of a hardship here.  The Defendant put his car in his name on, I think it was July 9th from my notes if I remember.  He had it for nineteen days is all he had it for before the offense.  He received it on July 9th. This offense occurred on July 28th.  He didn't pay anything for it.  So there's no hardship to him losing any type of money as a result of this.
>
> The car at the time it was seized had ninety-eight thousand miles on it.  It was in poor condition.  The value of the car was very comparable to the value of the drugs that were seized

24

from the Defendant. So again, the value of this vehicle being minimal, quite frankly, is proportionate to the seriousness of the conduct involved. It doesn't create any type of hardship for the Defendant here.

So I'm going to find that it is proportionate and thus is subject to forfeiture.

{¶66} Based upon the foregoing, we cannot say that the trial court erred in ordering forfeiture of the 2004 Dodge Stratus.

{¶67} Consequently, Walker's fifth assigned error lacks merit.

{¶68} In his sixth assigned error, Walker contends:

{¶69} "The trial court's imposition of consecutive sentences, in case numbers 2021 CR 001101 and 2021 CR 001234, was not supported by the record."

{¶70} This court reviews consecutive felony sentences pursuant to R.C. 2953.08(G)(2). That subsection provides, in pertinent part:

> The court hearing an appeal under division (A), (B), or (C) of this section shall review the record, including the findings underlying the sentence or modification given by the sentencing court.
>
> The appellate court may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing. The appellate court's standard of review is not whether the sentencing court abused its discretion. The appellate court may take any action authorized by this division if it clearly and convincingly finds either of the following:
>
> (a) That the record does not support the sentencing court's findings under division * * * (C)(4) of section 2929.14 * * *;
>
> (b) That the sentence is otherwise contrary to law.

{¶71} Pursuant to R.C. 2929.14(C)(4), separate prison terms for multiple offenses may be ordered to be served consecutively if the court finds it is necessary to protect the

25

Case Nos. 2022-L-077 and 2022-L-078

public from future crime or to punish the offender; that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public; and if the court also finds any of the factors in R.C. 2929.14(C)(4)(a)-(c) are present. Those factors include the following:

> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

> (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶72} To impose consecutive terms of imprisonment "a trial court is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry[.]" *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 37.

{¶73} Here, at sentencing, the trial court stated:

> The Court does find that in regards to running these prison terms consecutive in each case, that consecutive service is necessary to protect the public from future crime by the offender, punish the offender and is not disproportionate to the seriousness of his conduct and to the danger he poses to the public and the offenses he committed in 21CR1234 were committed while he was on bond in Case 21CR1101, as well as the fact that just his history of criminal conduct demonstrates that consecutive sentence is necessary to protect the public from future crime committed by the defendant.

26

Case Nos. 2022-L-077 and 2022-L-078

**{¶74}** These findings were incorporated in the sentencing entry as follows:

> Pursuant to R.C. 2929.14(C)(4) and R.C. 2929.19(B)(2)(b), the Court finds for the reasons stated on the record that consecutive sentences are necessary to protect the public from future crime or to punish the Defendant and are not disproportionate to the Defendant's conduct and the danger the Defendant poses to the public; and the Defendant's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the Defendant.

**{¶75}** Walker argues that because the PSI contained an "ORAS" score of 32, which indicates only a "moderate" risk for reoffending, consecutive sentences were not warranted. Walker further maintains that his education (high school graduate), employment history, and substance abuse treatment weigh against a determination that his criminal history demonstrated a need to protect the public from his future crime and this consecutive sentencing factor was not supported by the record.

**{¶76}** However, there is no dispute that Walker has a lengthy criminal history, including several juvenile delinquency adjudications, and numerous felony and misdemeanor convictions as an adult, resulting in imprisonment on five previous occasions. We do not clearly and convincingly find that the record does not support the trial court's finding that Walker's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from his future crime.

**{¶77}** Accordingly, Walker's sixth assigned error lacks merit.

**{¶78}** In his seventh assigned error, Walker argues:

**{¶79}** "The trial court's sentence of Appellant in case number 2021 CR 001101 was contrary to law because R.C. 2967.271 (the "Reagan Tokes Act") is unconstitutional under the United States and Ohio Constitutions, both on its face and as applied."

27

Case Nos. 2022-L-077 and 2022-L-078

{¶80} After the jury trial, Walker filed a motion in which he argued that indefinite sentencing imposed pursuant to the Reagan Tokes Law was unconstitutional. The trial court overruled the motion. On appeal, Walker argues that the Reagan Tokes Law violates separation of powers as well as Walker's rights to due process and to a trial by jury.

{¶81} Initially, we note that in the stated assignment of error, Walker contends that the Reagan Tokes Law is unconstitutional both on its face and as applied. However, although facial challenges to the Reagan Tokes Law are ripe for review, this court has concluded that as-applied challenges are not ripe until application of the Reagan Tokes Law in actuality impacts the offender causing some specific harm. *State v. Tornstrom*, 2023-Ohio-763, --- N.E.3d ----, ¶ 17-19 (11th Dist.). We limit our discussion accordingly.

{¶82} As we have previously noted, the issue of the facial constitutionality of the Reagan Tokes Law is currently pending before the Supreme Court of Ohio. *See, e.g., State v. Hacker*, Sup. Ct. Case No. 2020-1496; and *State v. Simmons*, Sup. Ct. Case No. 2021-0532. This court has addressed the constitutional challenges that Walker advances in *State v. Moran*, 2022-Ohio-3610, 198 N.E.3d 922 (11th Dist.) and *State v. Taylor*, 2022-Ohio-3611, 198 N.E.3d 956 (11th Dist.). Therein, we "determined that the Reagan Tokes Law does not violate the doctrine of separation of powers, an appellant's constitutional rights to due process, fair trial, or trial by jury, and, further, that it is not void for vagueness."[4] *State v. Stearns*, 11th Dist. Lake No. 2021-L-091, 2022-Ohio-4245, ¶ 29,

---

4. Further, "the constitutionality of the Reagan Tokes Law has been addressed by other Ohio appellate courts, each of which has declared that the sentencing scheme does not facially violate an inmate's constitutional rights." *Moran* at ¶ 4, citing *State v. Barnes;* 2d Dist. Montgomery No. 28613, 2020-Ohio-4150, *State v. Hacker*, 2020-Ohio-5048, 161 N.E.3d 112 (3d Dist.), *appeal allowed in part*, 161 Ohio St.3d 1449, 2021-Ohio-534, 163 N.E.3d 585; *State v. Bontrager*, 2022-Ohio-1367, 188 N.E.3d 607 (4th Dist.); *State v. Ratliff*, 2022-Ohio-1372, 190 N.E.3d 684 (5th Dist.), *appeal allowed*, 167 Ohio St.3d 1481, 2022-

28

Case Nos. 2022-L-077 and 2022-L-078

*appeal allowed*, 2023-Ohio-554. Walker recognizes that this court has previously addressed these issues, and he raises them to preserve them for review.

**{¶83}** For the reasons stated in *Moran* and *Taylor*, Walker's seventh assigned errors are without merit.

**{¶84}** Accordingly, the judgments are affirmed.

JOHN J. EKLUND, P.J.,

MARY JANE TRAPP, J.,

concur.

Ohio-2765, 192 N.E.3d 516; *State v. Maddox*, 2022-Ohio-1350, 188 N.E.3d 682 (6th Dist.); *State v. Delvallie*, 2022-Ohio-470, 185 N.E.3d 536 (8th Dist.) (en banc), *appeal allowed*, 166 Ohio St.3d 1496, 2022-Ohio-1485, 186 N.E.3d 830; and *State v. Guyton*, 12th Dist. Butler No. CA2019-12-203, 2020-Ohio-38.37. *See also State v. Guyton*, 1st Dist. Hamilton No. C-190657, 2022-Ohio-2962, *appeal allowed*, 168 Ohio St.3d 1418, 2022-Ohio-3752, 196 N.E.3d 850, ¶ 1; and *State v. Runner*, 2022-Ohio-4756, 204 N.E.3d 162 (7th Dist.).

Case Nos. 2022-L-077 and 2022-L-078